Filed 5/6/14  P. v. Nunez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN NUNEZ,<br><br>    Defendant and Appellant. | B246269<br><br>(Los Angeles County<br>Super. Ct. No. BA396860) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed.

Maggie Shrout, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson and Elaine F. Tumonis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Juan Nunez appeals following a jury trial in which he was convicted of assault with a firearm (Pen. Code, § 245, subd. (a)(2)[1]) and carrying an unregistered firearm (§ 25850, subd. (a)).[2] He was sentenced to 7 years 8 months in prison. He appeals, contending the admission of gang evidence constituted reversible error. We affirm the judgment.

*FACTUAL & PROCEDURAL BACKGROUND*

On April 23, 2012, at approximately 2:30 a.m. Jorge Claudio was driving his taxicab on Avalon Boulevard in Los Angeles. While he was stopped at a red light, he saw four men standing in a small area of land at an intersection. Three of the men were wearing black sweaters or sweatshirts and one was wearing a green sweater or sweatshirt. At least one of them wore a hat. One of the men was pointing a gun at the taco stand across the street. The traffic light turned green and as Claudio turned, he heard a loud noise and felt something on his neck. The glass in the center of his front windshield was dented. Looking in his rearview mirror, he saw his rear window was cracked. Claudio drove off and found Los Angeles County Sheriff's Detective Dean Camarillo and his partner a few blocks away. They followed him back toward the area where the shooting occurred. When Claudio saw four men standing one block away from where the shooting occurred, he recognized them by their clothes and not by their faces. He jumped out of the taxi, pointed at them and shouted, "These are the guys." Two of the men ran off. The two who stayed in the area, appellant and Gonzalez, were arrested.

---

[1]    All subsequent undesignated statutory references shall be to the Penal Code.

[2]    Appellant had also been charged with carrying a stolen loaded firearm (§ 25850, subd. (a)) but that count was dismissed prior to trial.

2

Detective Camarillo found appellant behind a truck with an open bed. Appellant tossed a firearm into the bed. Detective Camarillo ordered him to walk away from the truck and to lie down. While he was following orders, appellant took off his black hat and a dark glove and threw them away. Another man, later identified as Miguel Gonzalez, went behind a parked car. Detective Camarillo's partner detained Gonzalez. Another taxicab driver detained Reyes Perez at a nearby location.

After being placed into custody, Perez was interviewed by Los Angeles County Sheriff's Detective James North. At first Perez said he did not see anything, and said he was not a "snitch." Perez then told Detective North he saw a gun in appellant's hand but did not know if he fired it. He heard the gun go off 30 or 40 minutes later, when he was 20 to 30 feet away and ran. He told North he knew that appellant shot the gun because it was "a new gun." Perez also told North that when he had been placed in a cell with appellant, appellant tried to blame the shooting on Perez. When North asked Perez to tell him what he saw, Perez asked him to close the door to the interview room and made a comment, "But this nigger's Mexican from a black hood, all right. . . ."

When Gonzalez was at the station and having his clothing examined, he asked Detective Camarillo whether it was going to prove if he shot a gun. He said he was not worried because appellant had shot the gun. Gonzalez later told Detective North that appellant shot at the taxicab.

At trial, Perez testified he was drunk the evening of the shooting. When asked if he was with appellant at the time of the shooting, he said "I think so." He did not see a gun and did not remember hearing a gunshot. When the police came, he ran. Perez said he did not want to testify. He initially denied he was concerned about his safety, but when asked if he said he did not want to testify because it would be dangerous for his family, he answered, "Always. Testifying is always bad." He claimed he did not know what he was saying when he was interviewed by the detective and did not remember the interview. A tape recording of the interview and a transcript were provided to the jury.

3

During a side bar conference, the prosecutor sought to introduce evidence that on the way to court, the prosecutor told Perez to tell the truth but he expressed concern for his family. When the prosecutor said to Perez that appellant was not an identified gang member, Perez replied, "No he is." Perez told the prosecutor appellant would not admit he was a gang member in a Black gang, and because he was Hispanic, he would get hurt by the Mexicans. The prosecutor indicated that she had not expected Perez to be afraid to testify. Defense counsel objected to introduction of this evidence on the grounds it was inflammatory and prejudicial and because the prosecutor had not disclosed the information to him beforehand.

The court ruled it would permit the prosecutor to introduce the testimony because it was relevant to explain why Perez was afraid to testify or said he was unable to remember what happened. It acknowledged the evidence was prejudicial "but not unduly prejudicial in light of the history of how this matter arose."

Once on the stand, Perez acknowledged he was afraid to testify and denied telling the prosecutor appellant was a gang member. Perez did admit that, during a break in his testimony, he had told defense counsel he had informed the prosecutor appellant was a gang member. On cross-examination, Perez again admitted he had told the prosecutor that appellant was a gang member and said there were a lot of reasons why he did not want to testify. He then denied being afraid of appellant and reiterated that he had been drunk that evening. He said he did not think he had told Detective North that appellant fired the shot and did not know who did.

Gonzalez, a 12th grader, testified at trial for the prosecution. He said he was with appellant Perez and another man at the time of the incident. Appellant had a gun but Gonzalez did not see him fire it. None of the others had a gun. Gonzalez initially denied telling the police that he saw appellant take the gun out of his pocket. Later, he admitted he saw appellant pull out the gun and put it back in his pocket after the shot was fired, but looked away when it was being shot. He admitted giving the police a fake name once he got arrested. He did not reveal the name of the fourth person because he did not want

4

him to get into trouble. He admitted he and Perez had been drinking beers that night. Gonzalez also answered "I don't remember" to many of counsel's questions.

Appellant's clothing was examined and numerous particles of gunshot residue were found. Gunshot residue was also found on Gonzalez's and Perez's clothing. The criminologist who found the particles testified the residue is easily transferred, and the findings meant the three either handled a weapon, shot a weapon, or came into contact with residue.

It was stipulated that appellant was not the registered owner of the firearm.

After the close of evidence, the court and counsel discussed jury instructions. Defense counsel indicated he did not want a limiting instruction given about the gang statement. He said, "Yes, I would rather that not be highlighted by an instruction."

In closing, the prosecutor argued that the identity of the shooter was clear because appellant had the gun when police arrived. She then discussed Perez's statements to the police and his testimony. She reiterated that Perez said he did not want to be a "snitch." She mentioned that he did say he had a "concern" for his kids but did not state outright that he was afraid of appellant because "it's a macho thing." Then she addressed his claim that he was too drunk to remember the incident and argued that he was still making sense, so he could not have been that drunk. She also specifically referred to the portion of the videotape when he identified appellant.

Defense counsel then argued that Perez fled and another unidentified man fled, showing awareness of guilt, but appellant stayed at the scene. He discussed Perez's interview and argued that Perez was clearly drunk because of the way he spoke. He then addressed the prosecutor's claims that Perez was scared. He disputed that claim, saying "If he was so afraid of [appellant], why in the world is he hanging around with him at 2:30 in the morning? . . . Folks, [Perez] lied because he does not want to be blamed for shooting the cab and for no other reason. He lied to Detective North when he pointed the finger at [appellant], and he lied to you each and every one of you." He argued that Perez was the shooter and thus had a motive to place the blame on appellant.

5

In rebuttal, the prosecutor addressed the claim that Perez was drunk. She argued that he was responding appropriately and intelligently to the police and acted accordingly with his claim he did not want to be a snitch. She replayed the CD of the interview for the jury. She referred repeatedly and specifically to Perez's testimony that appellant was a gang member and repeatedly referred to him as a "reluctant witness." She said "That is not a master liar. This is South Central Los Angeles. He doesn't want to snitch."

*DISCUSSION*

Appellant contends it was reversible error for the trial court to allow the admission of gang evidence. "Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (Evid. Code, §§ 210, 352; [citations.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

"Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citaitons.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

"It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible. [Citation.]" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1450.)

6

Where no gang enhancement has been alleged, evidence of gang membership may be prejudicial and should not be admitted if its probative value is minimal. (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.)

A trial court's admission of gang evidence is reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547.)

We see no abuse of the trial court's discretion in admitting the gang evidence. The percipient witnesses, Perez and Gonzalez, both demonstrated a reluctance to testify. Although Gonzalez identified appellant as the shooter, he also refused to name the fourth person who had not been apprehended. His credibility was also suspect since he had given a false name when arrested.

The evidence of appellant's gang membership helps explain why Perez was less than forthcoming especially since the defense theory was that Perez committed the crime and was trying to blame appellant. The prosecutor was entitled to present evidence explaining his sudden reluctance to testify. Under these circumstances, the gang evidence was relevant to the credibility of the witness, and had substantial probative value, thus outweighing any prejudice.

The facts of this case are entirely different from *People v. Cardenas* (1982) 31 Cal.3d 897, *People v. Avitia, supra,* 127 Cal.App.4th 185, and *People v. Perez* (1981) 114 Cal.App.3d 470, cited by appellant. In those cases, the gang membership had no tendency to prove disputed facts.

In *Avitia*, the gang evidence was graffiti found in the defendant's bedroom. No gang enhancement was alleged and there was no evidence the offenses charged (discharging a firearm and possession of assault weapon) were related to gang activity. The graffiti evidence was proffered to show that the gun used in the crime belonged to the defendant. But the graffiti was cumulative evidence since the defendant offered to stipulate to the ownership of the weapon. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.)

In *People v. Cardenas, supra*, 31 Cal.3d 897, the admission of gang evidence was offered to show that the defense witnesses were biased. But evidence had already been admitted that the defendant and the witnesses were neighborhood friends, and thus the fact that they were all members of the same gang was cumulative and more prejudicial than probative. (*Id.* at p. 904.)

In *People v. Perez, supra*, 114 Cal.App.3d 470, the evidence that in a prior incident the defendant had shot at the house of a rival gang member had no bearing on the issue of identity of the perpetrator in that case. In addition, the trial court did not indicate that it had weighed the probative value of the evidence against the potential for prejudice. (*Id.* at p. 478.)

Here, the evidence was relevant to the credibility of the witnesses. There was no additional evidence about gangs which was presented to the jury. The only motive given for the shooting was that appellant had a new gun. There was no suggestion that the shot was fired at a rival gang or in a territorial dispute. The trial court did weigh its probative value against the potential for prejudice and we cannot say that it abused its discretion in deciding to admit the evidence.

Appellant also contends the admission of evidence was a violation of his federal due process rights.[3] Under federal rules, admission of membership in a gang may be used to show bias and the court has wide discretion in determining whether the probative value of that membership outweighs the prejudice of the admission of that evidence. (See *U.S. v. Abel* (1984) 469 U.S. 45, 49-50, 54-55.) The issue in determining whether the error violated federal due process is not whether the admission of the evidence violated state law evidentiary principles, but whether the trial court committed an error which rendered the trial arbitrary and fundamentally unfair. (See *Jammal v. Van de*

---

[3] Although appellant did not raise this claim at trial, he has not forfeited it on appeal. (*People v. Valencia* (2008) 43 Cal.4th 268, 280, fn. 3.)

8

*Kamp* (9th Cir 1991) 926 F.2d 918, 919-920.) Using this test, we cannot find any federal constitutional error.

Finally, we note that even if any error could be found, it was harmless. "The erroneous admission of gang evidence . . . requires reversal only if it is reasonably probable that appellant would have obtained a more favorable result had the evidence been excluded. (Evid. Code, § 353, subd. (b); [citations.]" (*People v. Avitia, supra*, 127 Cal.App.4th at p. 194.) Appellant argues the standard is harmless beyond a reasonable doubt pursuant to the federal constitutional harmless-error standard. This standard, frequently referred to as the *Chapman* standard, requires reversal of a conviction unless the People have established beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] [federal constitutional error requires proof of harmlessness beyond a reasonable doubt].) There are two formulations for this standard: (1) "Under this test, the appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.) (2) Federal constitutional error is properly found harmless under the *Chapman* standard if a thorough examination of the record demonstrates beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. (See *Neder v. United States* (1999) 527 U.S. 1, 15 [119 S.Ct. 1827, 144 L.Ed.2d 35]; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

Under either the *People v. Watson* (1956) 46 Cal.2d 818 standard enunciated in *Avitia, supra,* 127 Cal.App.4th at page 194 or the *Chapman* standard, however, any error was harmless. Appellant had possession of the gun when apprehended by the police at the scene of the crime and two of his companions testified he was the shooter. The record demonstrates beyond a reasonable doubt he would not have obtained a more favorable verdict in absence of the gang evidence.

*DISPOSITION*

The judgment is affirmed.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**                    **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10